We have a case based on religious objections to actions and the relief granted goes beyond that. We have a statute of limitations issue. Is there some way for the parties to address now and maybe discuss among themselves perhaps not total agreement on what could be done if something is to be done at all? That's not been decided to limit the effect of the district judge's ruling. And the other, I suppose, is really for Braidwood, which is on the briefing request. It seems to me that the request that will affect change the deadline for the briefs from August to November is a bit unusual. Amici briefs are filed in all sorts of cases. I'm not sure why that is being sought in this case to prolong the briefing like that. So with those preliminary thoughts, we'll hear from Ms. Klein. Thank you, Your Honor. Elisa Klein for the government. I just want to start with your last question because a plaintiff's counsel was accommodating our request. We heard from our amici that they would like an opportunity to participate in the cross appeal because there are some very significant issues that we are expecting the plaintiffs to raise at that stage that they will have no opportunity to address if they only file seven days after our opening brief. Well, there are plenty of amicus briefs filed in cases all the time, and we don't adjust the briefing deadlines for that reason. I understand, Your Honor. I know the court directed it at Braidwood, and I wanted to make clear this was our request. Okay. Well, I appreciate you correcting that. I had forgotten that. And that's the reason. I have not in decades had this come up much because there are not many cases with cross appeals in which there are amici that really want to address both sets of issues. So we were just trying to make sure we built in time for the amici to come in not only on the opening brief, but the cross appeal brief, and then make sure we had time, you know, and that they had time to respond adequately. Well, I may have forgotten who brought the motion, but it is an agreed motion, I believe. It's an agreed motion. It was on our motion with consent. Yes. Okay. And I will also attempt to be very succinct on the points that are before the court. We don't need to stray into everything. Two brief points on our stay motion. The first is that the district court entered universal remedies without considering the balance of equities or the public interest, and that that is legal error under the precedence of this court and the Supreme Court. The Supreme Court in winter made clear that you consider the balance of equities on any injunction, so permanent as well as preliminary. This court in the Louisiana versus Biden case involving the CMS vaccine rule, the vaccination rule for healthcare workers, made clear that nationwide injunctions are not the norm and require a consideration of the particular circumstances. And then with respect to what gets called universal vacator of final agency action, this court's recent en banc decision in the Cargill case involving the bump stocks final rule made clear that even in that context, which is not something we have here, that vacator is not automatic. It's not required. The problem here seems to me vacator comes from the decision on the appointments clause, does it not? The district court treated its appointments clause conclusion as requiring automatically vacator of Regardless of automatic or whatever, once the district court decided that all these decisions were beyond the authority of the body that made it, I'm not sure what relief would have been appropriate. Of course, you have a view of that, but it does seem to me that that does undermine everything they did. No, again, of course, the district court's judgment will be subject to review, and our merits brief is due in two weeks, and the court will see it quite soon. But the point is the remedy, whenever a federal statute or a state statute gets challenged, the appropriate remedy is an order from the district court to the officials charged with enforcing the statute, don't enforce it against the plaintiffs. That's the normal remedy. Well, that was part of the reason for my suggestion, and I'm not terribly optimistic about it, but is there a way to structure a stay if we are going to continue a stay, which is not at all certain that we will, in light of what you're talking about? It doesn't fit well with a vacator, but it does fit very well with injunction, based on what the claims actually are and the limitations on those claims, such as statute of limitations. Well, we think the district court has already done that in the part we're not asking for a stay of. The district court said, defendants, so that's the three agencies, you may not enforce this statutory requirement against Braidwood or, to the extent applicable, the other plaintiffs. And that's analogous to the relief the Supreme Court issued in the contraceptive coverage law, where you had religious objections to this same coverage requirement with respect to contraceptives in particular. So we're not asking for a stay of the part that, Your Honor, looked like. Well, I have a bunch of questions, but you said you had two threshold points, and you made your first. So the first is that, regardless of the type of universal remedy, there has to be a consideration of the balance of equities and the public interest. It's never automatic. And then the second is that, here, the balance of equities, again, we're not objecting to the plaintiff's specific relief, but they overwhelmingly precluded universal remedies that extinguished the rights of about 150 million people who are not party to this case or before the court. And, again, with no appreciable impact on the plaintiffs at all. They have no interest in the terms of the two and a half million group health plans that are offered by employers for whom they don't work. I mean, this is just, these are other people's plans, and it's very important to the people insured under those plans that they have this cost-free coverage for the 50 categories of preventive services that get the A and B rating. Is this the Buckley versus Vallejo point, or are you largely making a constitutional argument against the district court's authority to enter an equitable 706 set-aside order here? We're saying even if, we're taking this court's precedent as a given. So we're looking to the most recent example, which is Cargill. And I know it's a plurality, but I didn't understand anyone to take issue with the remedial directive, which was district court, you don't have to vacate universally. You can consider a more limited remedy, injunctive, declaratory, or otherwise. And in that same passage, the court said— What's the acronym for this entity? We just call it the task force, so yes. How can the task force correct its own unconstitutional authority, its composition? So in other words, you're not asking for a remand without vacater, are you? No, we're not asking for remand without vacater, but that was also true in Cargill. The question was, would it be limited to you can't enforce this bump stocks rule against Cargill. And again, the norm when you have a federal statute that a district judge declares unconstitutional is you enjoin its enforcement against the plaintiff. And I'll just give a recent example. Could it be narrowed to enjoin as to the private insurers just in the Texas market? It could conceivably. We don't—I mean, to answer the important question is yes. Like, that would be very different from insurers in all the other states where the plaintiffs can't even buy a plan and every group health plan in which they have no interest. But again, even with respect to Texas insurers, to have it be parallel to what we saw in the contraceptive coverage litigation, it would assume a willing insurer. So Blue Cross Blue Shield of Texas, if you want to sell the desired plan to these plaintiffs, you know, the defendants can't take enforcement action against you. And if that were the injunction, I can't imagine we would be here. Am I right that—I mean, I read the July 2022 hearing. It was all focused on Braidwood. So as to the individual plaintiff's standing, the theory here and the government would— are you arguing that the government's likely to succeed in showing they don't have standing on all three prongs? No injury, no traceability, no redressability? We've focused on traceability and redressability. But also to be clear, for present purposes, we don't think the court needs to decide standing as opposed to irreparable harm. What is the harm to them from a stay of the universal remedies? And we don't see any harm during the pendency of this appeal or potentially ever from staying the universal remedies. Okay. I guess—and I don't want to just—your time is precious. But if they're right, how do the individuals get protection unless the entire market adjusts? Well, at most, this would be a tailored remedy that lets insurers on the Texas exchange, if they want, sell them plans that exclude the particular drug coverage from their formulary. Now, again, we're not conceding that there are any willing sellers out there. I understand that because of time. Yes. But that would be— I'm going to move you to standing because it's a very difficult area, and I have similar questions both sides. Am I right that the only logic that these individual plaintiffs have is the lost opportunity to buy logic? Yes. And it assumes that there would be an opportunity but for this statutory requirement. And you say that's not true, or you say there's an issue of fact as to that? We say the uncontested record evidence, we cited to the Lords-Miller Declaration, is that as of 2019, which is before the task force A rating kicked in, all of the insurers on the Texas marketplace were already covering these two FDA-approved drugs to prevent the spread of HIV, to which the individuals are saying they object. And they're saying we won't buy a plan if it includes that drug on the coverage under the formulary. But then when you attach your declarations for the stay motion, it seemed to me the government was arguing that the harm here is that insurance companies will do just that. Okay. So this is a very important distinction. We don't think Texas insurers are poised to carve the prophylaxis drugs out of their formulary. When you talk about the universal remedies, now we're talking about 2.5 million group health plans, 50-odd preventive services that are covered, some of which are quite expensive. And there it's very easy to imagine across the country different plans and different insurers saying, well, you know, I didn't cover lung cancer screening until 2022, I'm going to pull back on that. Or I'm going to add copayments or, you know, not cover colonoscopies for the 45 to 49 range. You know, once you scroll out to the universal remedies, we are talking about, you know, 50 different types of life-saving preventive care. So the summary judgment record doesn't include a fair inference that they would sell without the coverage? I'm sorry. Who's the they? The insurance companies. So the summary judgment record I'm talking about is just on a very narrow point. It's about whether there were insurers in Texas who are likely to sell the desired plans. Or who did up until ACCA, correct? Well, the record makes clear they did not in 2019, which was before the task force A rating kicked in. Okay. So we know, that's why I made reference to Layal, because it was, there's a That's your fundamental argument. That is one of them. There are other separate standing issues, such as we think their declarations fairly read show that they dropped out of the commercial market. You know, some of them in 2016 because of the expense. And there's nothing to suggest that that has changed. Their declarations don't say we will buy a plan. Again, for purposes of the stay motion, there's certainly nothing that suggests that they're going to imminently do anything. And there's nothing that suggests that any remedies, either for insurers that sell outside of Texas When you say they, I'm going to ask you to correct the same pronoun. You say they insurance companies, not they plaintiffs. You're not saying plaintiffs will buy. I'm saying the individual plaintiffs, so you know, Mr. Kelly, Mr. Starnes, and the Maxwells, they don't even commit to buying insurance regardless. And their declarations make clear they dropped out because of cost, among other reasons. The uncontested record, now we're talking today is the Texas exchange insurance companies, shows that they were all covering the objected to drugs even before they had to. So that's one side of the balance of equities. And then on the other side of the ledger is enormous harm. It's irreparable harm per se to interfere with the government's ability to enforce or execute a statute. And these preventive services are meant to be gotten early so that you detect, you know, cancer and prevent heart attacks and strokes and, you know, all of these things. The whole point that, you know, the reason Congress said you've got to cover all these services without cost sharing is to get people to get them in a timely fashion so they don't get the, you know, disease at a point where the survival rates are much lower. So unless the court has questions. No, no, no, I just was going to make sure colleagues had time. You've only got a minute, but I can fill that. Let me also say this is our only argument of the afternoon. We don't need to extend it too far, but. Yeah, I'm not going to extend it. But you can go more than a minute and 30 seconds. Do you have a case that, and are you arguing that a plaintiff has to bring an APA claim in their complaint as distinct from, do you understand where I'm going with this? Just alleging facts that would. Yeah, and that's not so much our quarrel as if you challenge the constitutionality of an act of Congress, the remedy is limited to defendants can enforce it against you. And I'll just give one citation, a recent example, you know, having nothing to do with this case, but Texas versus Yellen. Five ninety seven. F's up third. One thousand five. One thousand nineteen. Northern District of Texas. Twenty twenty two. We didn't cite it, but I gave it to my colleague earlier today to make sure I wasn't bringing up anything he didn't see. That's just it's a case. It was a constitutional challenge to a provision of the American rescue. But it seems to me the problem here and it's where I started and why I'm not terribly optimistic the two sides could just tell us what really needs to be stayed now if we're going to stay anything. But it seems to me the problem with that case is it wasn't finding Congress was unconstitutionally created. And here the promulgator of the regulations or the rules is not properly constituted. And so it just seems to me it's not apples and oranges, but it's entirely different sort of analysis. And I just don't know how you limit necessarily the remedy that's given once you say that no pronouncement by this group can be given legal effect. Two points. First is in two weeks in our merits brief we will be taking issue with the argument that this statute cannot be enforced. But for more immediate. Well, you just make sure an argument seems for purposes. Now you're accepting the appointments clause decision. It's just where we go from that insofar as the stay is concerned. Correct. I mean, you're not challenging it for now. I know you're not saying I surrender. But insofar as we need to decide, which is on the state, we don't have the appointments clause accuracy of that decision before. So anyway, I stepped on your answer. I'm here to answer your question. So the other is on the contrary, the Supreme Court and lower courts in the appointments clause context in particular have been loath to disturb past agency actions. And that's both the Buckley versus Vallejo point. But also it came up more recently in the First Circuit case involving the PROMESA Puerto Rico statute, a case called Aurelius. And we ended up winning in the Supreme Court on other grounds. But the First Circuit correctly recognized in Aurelius that even though the First Circuit had concluded there was an appointments clause violation, it was not as a remedy going to set aside any of the past acts of what it regarded as improperly appointed members of the board. All right. Thank you. Anything else from up here? All right. Thank you, Counsel. Thank you, Your Honors. May it please the Court. The government's request for a partial stay pending appeal. Jonathan Mitchell on behalf of the Appellees and Cross Appellants Braidwood Management et al. Your Honors, the government's request for a partial stay of the district court's judgment pending appeal should be denied for numerous reasons. First, there is no evidence or reason to believe that any private insurer or employer will drop or limit coverage of statutorily required preventive care in response to the district court's ruling while this case remains on appeal. As long as it remains possible that the district court's judgment might be vacated or reversed even in part, no rational employer or insurer can take the risk that they could be subject to statutory penalties in response to conduct they're taking right now. Now, Mr. Mitchell, I don't quite see how that fits into our analysis. You may be right, but it really is speculation. You want us to apply our sense of how insurance companies will react. That sounds fairly unusual to me as a way to analyze whether a stay is proper. One of the factors to consider on a motion for stay pending appeal is whether there will be irreparable harm either to the government because its laws are not being obeyed or harm to others. The government has talked a lot in their briefing about potential harm to public health if any of these coverage mandates are no longer being obeyed by employers or insurers. You're still asking us to predict how insurers will react, and I'm not sure what we have to go on. Your Honor, I don't think there's any other way to evaluate the irreparable harm prong other than by predicting either through evidence or through rational speculation how the public will respond and how private entities will respond when the statute remains on the books. Judge O'Connor's ruling cannot formally suspend the law itself. All a district court judgment can do is to temporarily restrain government officials from taking enforcement action while that judgment remains in effect, but it does not confer permanent immunity or a preemptive pardon on those who choose to violate an existing statute in reliance on a district court judgment declaring that statute unconstitutional. So in a way, this observation can cut in both directions. The government points this out near the end of their reply brief. There may be a natural reaction to think maybe there's no harm, no foul in issuing a stay because after all, if all the employers and insurers will comply with the ACA regardless pending appeal, why not just issue the stay and bring about needed clarity? That's how I understand the government's argument in their reply brief. But that's really inviting the court to do something that in our view is the responsibility of Secretary Becerra and the executive branch. They should be the ones who say that despite Judge O'Connor's judgment, which they will comply with and respect, the statute still is in effect and there is still legal jeopardy given the statutory penalties that would be facing any employer or insurer who chooses to cut back on the scope of mandatory preventive care coverage in reliance on this current district court judgment that could very well be vacated or reversed on appeal. Related to that, but it does go to standing, which I feel more confident discussing. What about the fact that the government's evidence showed that the all qualified plans in Texas offered the challenged coverage immediately prior to ACA? So there are two ways. Let's separate Braidwood from the other plaintiffs because I think Braidwood's standing is much more clear. Braidwood has a self-insured plan. So the fact that the government's telling Braidwood. You heard me. I went back to the July hearing and at that you were very candid and said as to individual plaintiffs standing is very close. It is a closer call. And it turns entirely on the lost opportunity doctrine. Well, I respectfully disagree. I think that's your word. Not that it turns entirely on that doctrine. I think there are two ways the private individual plaintiffs can get standing. One is what Your Honor just mentioned, this purchaser standing doctrine, which is not yet a doctrine or theory of standing that this court has recognized. But there's another way they could get standing, which is to piggyback on Braidwood because if you have a plaintiff that's seeking the same remedy as a plaintiff that clearly has standing, then they don't need to show Article III standing in their own right. But it's a remedy here. Well, the remedy turns on whether Braidwood can seek a universal remedy by relying on the APA. If the court ultimately agrees with us on that question, then the other plaintiffs can similarly seek a universal remedy without having to demonstrate Article III standing independently. So, Your Honor, we've acknowledged candidly in the district court and we'll acknowledge that similarly when we submit our merits brief in this court, that the individual plaintiffs have a closer case on whether they can independently show standing, but they may not need to independently show standing because if Braidwood can seek the universal remedy under 706 of the APA, then the other plaintiffs can come along for the ride because Braidwood's Article III standing is indisputable. The question then becomes, can Braidwood get this universal remedy? This is a significant retreat, as I see from much of your brief. How do you see it as a retreat, Your Honor? As I understand it, you were primarily arguing that the individual plaintiffs have standing themselves. We do. We do. We still believe they do, Your Honor. What we are suggesting, though, is we don't have to show that they have standing under Purchaser Standing Doctrine in order to win. And the way I understood Your Honor's earlier question was that their standing hinges entirely on Purchaser Standing. I just wanted to add the caveat, they may still be able to free ride or piggyback on Braidwood's standing as long as Braidwood can seek the universal remedy under 706 of the APA. If Braidwood can seek that remedy, the other plaintiffs don't need to show Article III standing in their own right to pursue the same remedy that Braidwood is seeking. The only time they would have to show standing is if they're seeking some type of remedy that differs from the remedy to which Braidwood is entitled. And all this will be fleshed out more in our Merits Brief. None of this was discussed in our State Briefing, so I'm sorry if I'm bringing up stuff that hasn't yet been presented to the panel. The State Briefing seemed to put Braidwood entirely aside. That's how I understood the government's argument, because they were not seeking a stay with respect to Braidwood. The government stressed more this point, at least fact dispute, as to whether individual insurers in Texas would have offered the challenge conduct immediately prior to ACCA. That is to say, the government action stopped them. Where would you point to in the record that that's not true, or is the premise of that question incorrect? No, the premise is correct. We need to show by a preponderance of evidence, based on what's in the district court record, that there would have been at least one, some insurer in Texas, that would or might, more likely than not, have offered a plan that excludes the unwanted coverage absent the mandate. So one way we did that was to look on contraception, which I know the judge ruled against us on the contraceptive mandate. Just as with prep coverage. Oh, prep coverage. Where would you point in the record? Just the mere fact that not every insurer was covering this stuff prior to the mandate that came forth from the Biden administration, that you have to cover this at zero marginal cost, no copay, no deductible. Do you have a record site for that? Not off the top of my head, Your Honor. In the briefing, it seemed to be that the evidence you point to were two years prior to FDA even mandating it. Right. So some of this is evidence that may have come before prep became more widely accepted. And certainly insurers were starting to cover it more than they were earlier on. The trend was toward more increased coverage. The question, I guess, for us is can the non-Braidwood plaintiffs, can they show by a preponderance of evidence, that there would be some insurer somewhere in Texas offering this? Or, and again, if that fails, they could try to go the Braidwood route and try to just say, we're seeking the same relief Braidwood is seeking, and therefore we don't need to make an independent showing of article 3 standing. So it doesn't necessarily mean they're going to be thrown out of the case if they can't make that empirical claim that Your Honor is describing in the question. But the other question, I think, is just whether the remedy can be universal in the first place. That's really where the government's— Well, that's the last question. I still have a few more questions. Okay, sure. If I'm focused on the individual plaintiffs, and they're standing through a doctrine our court hasn't yet adopted, are there any D.C. circuit cases that reiterate injury in fact, under the lost opportunity doctrine, that post-date Lujan or Summers or TransUnion? Yeah, so the ones that we cited in our brief, and I can't remember the exact dates on those, they all post-dated Lujan. I'm not sure about TransUnion. That was a really recent case from the Supreme Court. Give me the best one that you think of. The best one, and again, I've got to go back and look at my district court briefing, Your Honor. I'm sorry, because we didn't focus on standing when we were briefing this issue of stay, so I'm not as prepared to discuss that. What I'm asking is, it seems like the affiants here, Kelly, I forget one name, Maxwells, are very like the affiants in Lujan. They wanted an opportunity to see endangered species. They said the government regulation disallowed that. The Supreme Court said just the intent to go doesn't count. That's right. Why isn't here the intent to buy similar? It's a more immediate, because they are currently participants in the health insurance market in a broad sense. This is not like the Lujan plaintiffs where they just said, someday I may take a trip somewhere to see this endangered species. Right now, every plaintiff in our case has to make a decision on how they will provide health care or health insurance coverage to themselves and their families. They are making choices right now at this very day. Their affidavits, and I'm sure you know them better than I do, don't seem to say that. Is Maxwells the best? Maxwells is one who said, I'm looking for health insurance right now. I'd love to. Yes. He was more emphatic than the others. Emphatic about a desire. That I desire. Not a stated intention. Correct. It may very well be that he wouldn't buy health insurance, even if some plan emerged that excluded the coverage. We did not say in any of these declarations that there's an ironclad guarantee that once some product like this appears on the market. What D.C. Circuit case allows injury in fact to rest on what I think of as a generalized grievance? I sure would like to have a cheaper insurance plan. Yeah. I mean, seriously consider it. And those are his words. Not I would intend to buy it. Right. The D.C. Circuit cases that we cited, I never went and actually looked at the affidavits or declarations that were submitted in support of those particular plaintiffs. What they tended to focus on was the unavailability of a product could inflict injury in fact. But the opinions themselves never went into that level of detail, Your Honor, in terms of saying what exactly do you need to show? How emphatic does your stated desire or your stated intention need to be to buy this particular product? And the question I think for the Court would be, once we brief this on the merits, is it enough to just say that I'm making a choice among products and the absence of a particular choice, is that enough to be injury in fact? Or do I need to say something more that I would actually buy that thing that I'm not able to get right now? And how clear does your intention have to be? These are difficult questions in Article III standing doctrine. There's always this question of probabilistic future injury. And cases are all over the place. Sometimes these probabilistic harms are sufficient, or the Supreme Court finds them to be sufficient. Other times, like Clapper, they say it's not. The three cases I said, Summers, Lujan, and TransUnion, are all no-standard cases. Yes. As I read the lost opportunity doctrine emerging in the D.C. Circuit, it predates that. And I'm not seeing cases that would affirm a statement like Maxwell's. I'd love to buy it. I'll seriously consider buying it. That may very well be right, Your Honor. We tried to say in our briefing that Braidwood clearly has standing. The standing of the individual plaintiffs is a much closer question. We're relying on a doctrine that this Court has not yet recognized, purchaser standing. We're borrowing from D.C. Circuit cases. This may or may not fly on appeal. If it doesn't, we still have the other route that I mentioned, where Braidwood, which does have standing, if they have the ability to seek a universal remedy by relying on the set-aside language in the APA, if, and I know that's an if, then the other plaintiffs can then rely on Braidwood's standing without having to show their eyes. Yes, Your Honor. I should have focused more on Braidwood, and I don't want to ask too many questions about this. But I thought their relief was fully granted. You know, so in terms of balancing the equities, they've got everything they wanted to stay. So I don't really see how we can import Braidwood to save the individual plaintiffs. That's why I got into the weeds on them. Yeah, so I think the question, Your Honor, becomes is Braidwood entitled to vacatur, right, not just an injunction that restrains the government from enforcing the disputed statute and the agency rules against them, but are they entitled to formal vacatur, revocation, universal? We believe vacatur is a universal remedy because, unlike with statutes, a court can never revoke a statute. They can enjoin an official from enforcing it, but they can never cancel or suspend the statute itself. But it's different with the APA. Because of that set-aside language, the D.C. Circuit has always treated a set-aside remedy as actually erasing the rule, which you can never erase the statute. You can erase the rule. So the question would be can Braidwood, by invoking 706 of the APA and this set-aside language, get a formal vacatur that wipes out the rule? They can't wipe out the statute. We acknowledge that. But they can if they rely on 706 of the APA. If they can get that, then the other private plaintiffs could have standing just by saying we're seeking the same remedy as Braidwood. But maybe Braidwood's not entitled. This is a disagreement we have with the government. They don't believe the set-aside language authorizes or requires vacatur here. I don't think they'll even get close to that big issue. I think they'll just say Braidwood got the relief it wanted at the stay level. They're out of the picture. You're left with it in terms of the balancing the equities. You're left with these individual plaintiffs. So Braidwood, when deciding whether this court should issue a stay, Braidwood just isn't relevant because Braidwood is safe no matter what this court does. They're making this limited request. Oh, we'll see. They should speak for themselves. You'll have five minutes. With respect to these individual plaintiffs, and I'm not sure where the burden lies because this court has already issued an administrative stay, so maybe it's my burden to show that the previous ruling of this court should somehow be disturbed. But if the government's burden is to show irreparable harm, balance of equities, all these different stay factors, we don't think they've come up with actual evidence or reason to believe that anyone's going to be departing from the current mandated coverage given the possibility of reversal. And again, there are two different points to make here. One is the appeals court decision that reverses the district court could drop at any time in the middle of a planned coverage year. But the second point, and I think the more important one, is if there is a statutory departure or a violation taken by any person, private insurer or private employer, in reliance on this judgment, they could be hit with penalties under the ACA, even if they acted in reliance on a district court injunction that later gets vacated. So maybe this ties back into Judge Southwick's question at the very outset. Is there some way that the two sides could possibly agree on a resolution pending appeal? Maybe there is that potential because from our standpoint, we don't believe anyone, even our own clients, should be changing their self-insured plans in reliance on the district court's judgment. Maybe there is a way we could come together to a stipulated resolution that makes that clear in something that might have the effect of the partial state of the government seeking. But depending on when your trips home occur, you might pursue that. I don't think we're that far apart. I mean, we do agree in our briefing with a lot of the government's critique of universal remedies, and I should make clear we believe there are only three circumstances that I can think of in which a district court can lawfully issue a remedy that goes beyond the named plaintiffs. One is a class action, which we don't have here, a certified class. The second would be where a remedy that goes beyond the named plaintiffs is necessary to fully redress the Article III injury that the plaintiff is asserting, and Judge Higginson, in some of your questions to Ms. Klein, touched on that possibility. And then the third is when a universal remedy is statutorily authorized, and this turns on whether set-aside in the APA can authorize a remedy that goes beyond the named plaintiffs. Those are the only three circumstances that I can think of in which a remedy that goes beyond the named individual litigants could be lawful. So, again, the first is not applicable here. I'm sorry. No, good. That's very clear, and it's helpful. Could you try to address the Cargill point? The Cargill? Her reliance on Cargill. So the way I looked at the opinion at the end, it just said we're remanding to the district court to decide what the remedy should be. I didn't interpret that language in Cargill as weighing in on whether that remedy should be limited to Mr. Cargill or whether it should be a universal remedy of vacatur. Cargill's an interesting case because, like ours, it's not a class action, and they're challenging the validity of an agency rule under 706 of the APA. And for full disclosure, Your Honor, I am representing the plaintiff in Cargill, so I didn't argue it in this court. We did go back on remand to the district court prepared to argue these same issues we're discussing today. Does this set-aside language in the APA require a universal remedy of vacatur, even though we didn't bring a class action? And I was eager to litigate that, but the district court, I don't know if Your Honor has followed what happened on remand, but he somewhat cut us off because he entered judgment for Mr. Cargill with no further elaboration, no relief specified. And we really have been nonplussed by that. We filed a motion for reconsideration saying if you're not going to award relief, shouldn't you be entering judgment for the defendant and not for the plaintiff? But this may all be moot soon because there's a cert petition pending at the Supreme Court right now. I'm happy to answer any other questions Your Honors may have. I'll fill a couple more. Do you care to explain why you dropped the APA claim here? I don't think we ever dropped it, Your Honor. We have been challenging from the outset the conduct of the named defendants. And the question of whether a vacatur of agency rules should occur is in our view a question of remedy and not necessarily one of claims. Do the facts allege an APA violation? That's how we understand the rules of notice pleading. And I respect where the government's coming from, but we certainly put them on notice that we are challenging the legality of the way these agencies are structured. And if the court is to find an appointments clause violation, I think it necessarily follows, as Judge Southwick implied earlier, that it's not just that they are enjoined from enforcing the statute, but they would also be enjoined from enforcing the agency actions taken to implement that statute. And that will include in some situations vacatur as long as we can fit within the relevant statute of limitations. If early, I wasn't even clear. It takes a lot of digging to know where all those agency actions are. True. And there will be future agency actions as well that I believe are covered by the district court's judgment, any action in the future, whether it's a rule or an adjudication or any type of agency threat to enforce the statute. So I do think it was appropriate for the district court to enjoin agency actions collectively. I don't think it's possible to enumerate every single one either in the past or in the future because under the APA, agency actions should be set aside if it's contrary to law. But all that will depend, I think, it'll rise or fall on whether the appointments clause analysis is correct, which will be part of the Barrett's appeal. Thank you. All right, Counselor, you may have heard your last question. Thank you for your assistance. Thank you, Your Honors. I'll be brief. First, I just want to give the citation to that PROMESA case I mentioned. First Circuit case? Aurelius is 915F3rd, and the relevant passage is 861-863. That's First Circuit 2019. And then with respect to Cargill, this is the plurality explicitly said, it's well established that a plaintiff's remedy must be tailored to redress the plaintiff's particular injuries, quoting the Supreme Court's decision in Gill v. Whitford. Here, it's conceded that the Braidwood specific injunction fully redressed Braidwood's injuries. So they can't be the basis for sweeping in universally everybody and saying we have a nationwide injunction and universal vacator. And so what we're left with are these four uninsured individuals in Texas. Even assuming they have standing, the absolute most that a tailored remedy would do is let a willing insurer on the Texas exchange sell them the policy they want. That's nothing like the universal remedies that the district court entered. The district court just mistakenly treated universal vacator as mandatory, as automatic, reflexive, with no consideration of the tailoring, of the circumstances of the balance of equities. I think one answer just orally is, though, where's the willing insurer if they're all facing penalty provision? Well, we're not saying there will be one. We're saying that the universal remedies, we're even giving them, you know, assuming standing, assuming that they're entitled to some sort of remedy, what would it look like? The very most they can do is go to the Texas marketplace, the Texas exchange, and buy a plan. And so the very most that a tailored remedy could do would be to say to, you know, Blue Cross Blue Shield of Texas or, you know, Aetna, whatever it is, like, you will not be penalized if you sell them the plan they want. And the fact that they're, as far as we know, zero willing insurers because the declaration shows that as of 2019 they were all already covering this prophylaxis drug that the plaintiffs find objectionable, that's not a basis for going universal. That's just a basis for giving no relief at all. The universal remedies are extinguishing statutory guarantees, protections, that 150 million Americans have. You know, often they have private enforcement mechanisms under ERISA against their own plans if the plans don't, you know, pay the full cost of their colonoscopy. And there is zero basis for having those universal remedies be in effect pending appeal, you know, further review of the merits issues. Again, just irreparable harm. The Supreme Court and this court have said... I'm going to just read from Maryland v. King. Any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury. So that's the Chief Justice, the in-chamber's opinion. This court has repeatedly followed it in its precedential decisions. It's not a controversial point. And here, just... I can't be overstated how important this guarantee of cost-free access is for the 150 million people who aren't here to protect themselves, who can otherwise be assured that when they go to get their mammograms or statins or colonoscopies or lung cancer screening, etc., that there's no out-of-pocket cost. I take it the government initially was, for lack of a better word, generous as DeBrade would, and opposing counsel thought you may be fairly close to some inventive solution as to these four individuals. Would you echo that you're pretty close? We are always open to anything the other side wants to offer. We don't... We're struggling to understand why they're opposing a stay of the universal remedies. Because in practice, on the ground, those universal remedies give no benefit to the individuals, even for their own coverage. They don't want exclusions of colonoscopies and statins and lung cancer, etc. So we see no reason that they want to jeopardize, you know, 150 million people's ability to get these services. Well, counsel, in light of that, though Mr Mitchell may not fully agree with it, I do urge you, as I think you're hearing from the panel, please do pursue this. It would help us, whatever we may do on this, if we have the understanding that both of you have of this case more than we can in our exposure to it, of what is the best thing to do if we're going to stay anything. To have your collective agreement as to what that is would be very helpful, or your collective near agreement with us dealing with less than the whole stay request. Thank you, Your Honour. Obviously I'll take it back to the client, and we will certainly communicate. Thank you. All right, thank you both. We'll try not to bring you down here for motions very often, but we appreciate the help today. We are in recess.